# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **RICHARD G. SMITH,** )<br>)<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**CITY OF TULSA, CHRISTOPHER WITT,** )<br>**In his official capacity as a police officer** )<br>**employed by the City of Tulsa and** )<br>**Individually, and TINA KENNEMER,** )<br>**formerly known as TINA DILLDINE,** )<br>**In her official capacity as a police officer** )<br>**employed by the City of Tulsa and** )<br>**Individually,** )<br>)<br>**Defendants.** ) | Case No. 11-CV-113-JHP-PJC |

## OPINION AND ORDER

Before the Court are Defendants' Motions for Summary Judgment [Doc. Nos. 50 & 51], Plaintiff's Responses to Defendants' Motions for Summary Judgment [Doc. Nos. 55, 56], and Defendants' Replies [Doc. Nos. 61, 62]. For the reasons stated herein, this Court finds there are material issues of fact to preclude summary judgment in regard to Defendants Christopher Witt's and Tina Kennemer's Motions for Summary Judgment and as such, their Motions For Summary Judgment are **DENIED**. Further, for the reasons stated herein, this Court finds there are no material issues of fact to preclude summary judgment in regard to the City of Tulsa's Motion for Summary Judgment and as such, its Motion For Summary Judgment is **GRANTED.**

## BACKGROUND

1

On July 27, 2010, at approximately 1:00 p.m., Tulsa Police Sergeant Christopher Witt ("Sergeant Witt") responded to a call at a Tulsa motel, the Tudor House. The manager told him there was a naked man named Richard Smith in Room 217 who was still in the room, two hours after checkout time. The manager told Sergeant Witt that they could not get the man to leave the motel room, and that he believed the man to be extremely intoxicated.

There were only three people present during the relevant time period: Sergeant Witt, Officer Tina Kennemer ("Officer Kennemer"), and the plaintiff, Richard Smith ("Smith"). Smith has no independent recollection of the events. The only evidence of what occurred is the Tulsa Public Safety Communications record, the testimony of Sergeant Witt and Officer Kennemer, and the physical evidence reported in the doctors' reports following the incident and documented in the photographs of Smith's body.

According to the records and his own testimony, Sergeant Witt arrived on the scene at 1:10 p.m. The remaining facts are disputed. Plaintiff's version of the facts are as follows: Sergeant Witt decided, despite the fact hotel staff had been in the room with Smith earlier and advised Smith was unarmed, alone and nonviolent, that it was not safe for him to enter the room and to talk with Smith. Instead, Sergeant Witt stood at the doorway, announced his presence, and told Mr. Smith to stand up, show him his hands and exit the hotel room. Smith, plainly intoxicated, remained laying on the bed, completely nonresponsive to Sergeant Witt's directions. Sergeant Witt proceeded to fire numerous rounds of pepper balls at Smith.

Pepper balls are launched at about 350-380 feet per second and burst upon contact, releasing a pepper spray like substance. Sergeant Witt testified that he has been struck by pepper balls in training, about four or five, and could not willingly withstand being struck by any more. Sergeant

2

Witt also testified that he has never used more than (30) pepper balls before on someone. He testified that, on another occasion, he had cause to use about thirty (30) pepper balls when the suspect was armed, barricaded and heavily clothed. In the instant case, Smith was not armed, not barricaded and completely naked. At no time did Smith show any signs of aggression or violence; he was simply nonresponsive, in a semi-conscious state. Nonetheless, Sergeant Witt proceeded to shoot Smith between seventy (70) and eighty (80) times with pepper balls in an effort to get Smith to voluntarily exit the hotel room. Officer Kennemer made no effort to intervene to stop Sergeant Witt's use of excessive force.

Defendants contend, however, Sergeant Witt found the door to Smith's room open. Smith was lying in bed naked, with his back facing the door. Sergeant Witt observed that the room was in disarray and that Smith had defecated on the bed and himself. Sergeant Witt observed that the door to the bathroom in the motel room was closed. It was unknown to Sergeant Witt at the time whether Smith was armed, or whether a weapon was hidden under a pillow, under the mattress, or on the floor out of his line of sight. Further, it was unknown to Sergeant Witt at the time whether another individual was in the bathroom.

Sergeant Witt announced himself as a police officer several times. Smith did not respond. After a few minutes, Smith, who weighed about 214 pounds, sat up in bed with his back towards Sergeant Witt. Smith turned around and looked at Sergeant Witt, then turned back around and reached toward the floor. Sergeant Witt responded by pressing the trigger on his pepper ball launcher, which released five to six pepper balls that struck Smith on the back. Pepper balls are small plastic balls filled with a substance made from cayenne pepper, and are approved for use by the Tulsa Police Department.

According to Sergeant Witt, pepper balls are a less forceful method of achieving compliance from a person than a device such as a Tazer or another type of weapon. Sergeant Witt felt that for everyone's safety, including Smith's safety, the use of pepper balls was a better option than physically confronting the large, naked, intoxicated man in the unknown and uncontrolled environment of the motel room.

Sergeant Witt believed the initial round of pepper balls had no effect on Smith. As Sergeant Witt continued to attempt to obtain compliance, Smith stood up and looked at Sergeant Witt. Smith took two steps toward Sergeant Witt, but then returned to the bed. In a further attempt to achieve compliance with his commands, Sergeant Witt again released four to five more pepper balls. Sergeant Witt contends Smith further resisted his commands, and lay back down on the bed with his back toward the door.

Sergeant Witt continued to attempt to draw Smith out of the motel room using a series of commands and the pepper ball launcher. At times, Smith would stand up and turn towards the door. However, Smith continually resisted the commands and would return back to bed, thereby forcing Sergeant Witt to utilize the pepper ball launcher in a limited fashion in hopes of gaining compliance with his commands.

During this time, a fellow officer, Tina Kennemer, arrived at the motel. As they were unable to obtain Smith's compliance with the use of verbal commands and the pepper balls, Sergeant Witt instructed Officer Kennemer to cover the motel door while he retrieved a Tazer from his car. When he returned, he spent another ten minutes ordering Smith to come to the door. Eventually, Smith came to the door and surrendered. The Tazer was never used.

The officers and EMSA personnel wrapped Smith in a blanket and helped him down the

stairs. Plaintiff was arrested for trespassing, and was transported to a hospital for evaluation. Plaintiff testified at his deposition that he remembered nothing about the incident.

## PROCEDURAL BACKGROUND

On February 24, 2011, Plaintiff filed his original Complaint, pursuant to 42 U.S.C. §1983, alleging his Fourth Amendment rights were violated due to the use of excessive force during his arrest by Sergeant Witt and Officer Kennemer. Plaintiff alleged Sergeant Witt and Officer Kennemer (identified in the original Complaint as John Does) were acting in their official capacity and individually, under color of state law and within the course and scope of employment. Plaintiff also named as defendant the City of Tulsa. The Chief of Police and two assistant chiefs were originally named as co-defendants, and later dismissed.

## DISCUSSION

**A.      Summary Judgment Standard**

A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©.   The Defendant moves for summary judgment claiming he is entitled to qualified immunity. Qualified immunity shields officers from suit for official acts, as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 201-202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citations omitted). As a result, The Supreme

Court has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Id*.

This Court's review of summary judgment motions in the qualified immunity context differs from that applicable to review of other summary judgment motions. *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citing *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009)); *see Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Whittier v. Kobayashi,* 581 F.3d 1304, 1307 (11th Cir.2009). In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *see Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009)(noting that generally "we accept the facts as the plaintiff alleges them"). "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record. . ." *Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir.2009)(internal citations omitted); *see also Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1258 (10th Cir.2008).

If the Plaintiff is successful in demonstrating that Sergeant Witt and Officer Kennemer violated a clearly established constitutional right, then the burden shifts back to the Defendants, who must prove that "no genuine issues of material fact" exist and that the Defendants "[are] entitled to judgment as a matter of law." *Gross v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir.2001). Therefore, the Defendants still bear the normal summary judgment burden of showing that no material facts remain

6

in dispute that would defeat the qualified immunity defense. *See Olsen v. Layton Hills Mall,* 312 F.3d 1304 ,1312 (10th Cir. 2002) citing *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Olsen,* 312 F.3d at 1312 citing *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991).

Prior to the Supreme Court's decision, in *Pearson*, courts were mandated, by *Saucier,* to engage in a structured two-step "sequence for resolving government officials' qualified immunity claims." This means the Court first decided whether "the facts alleged show[ed] the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. Following this inquiry, a court had to determine whether the right violated was clearly established when violation occurred. *Id. Pearson* modified this formula, by reconsidering *Saucier's* "rigid order of battle." *Pearson*, 129 S.Ct. at 815. As a result, district courts may "exercise their sound discretion in deciding which of the two prongs" to address first. *Id.*

Given this choice, this Court opts for the *Saucier* procedure. Having done so, the Court must first determine "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 200. Using this standard, this Court finds the Plaintiff has shown a constitutional violation.

**B.     Did the use of force constitute a constitutional violation?**

In the first step of the qualified immunity analysis the plaintiff must first "demonstrate that the defendant's actions violated a constitutional or statutory right." *Nelson v. McMullen,* 207 F.3d 1202, 1206 (10th Cir.2000) (quotation omitted). In doing so the courts look at the reasonableness of the Officer's conduct.     In this analysis the Court asks whether the officers' actions were

7

"'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

An officer's use of force is subject to this reasonableness requirement. *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Reasonableness "must be judged from the perspective of a reasonable officer on the scene," who is "often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-397. The Supreme Court has held that, "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of force to do so." *Garner,* 471 U.S. at 11.

As the Tenth Circuit noted in *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009), "[t]here is no easy-to-apply legal test for whether an officer's use of force is excessive; instead, we must slosh our way through the fact-bound morass of 'reasonableness.'" (Internal citations omitted) In doing so, we must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* Some of the factors Courts have found useful when conducting this analysis include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* citing *Weigel v. Broad*, 544 F.3d 1143, 1151-52 (10th Cir.2008).

There is disagreement between the parties regarding whether it was reasonable for Sergeant Witt to use the amount of force he did to effectuate the arrest of Smith and whether Officer

Kennemer had a duty to prevent the use of excessive force to Smith. There is no question Smith was reported by the Tudor House Inn as naked, unarmed, and nonviolent. Plaintiff's version of the facts however, differ significantly from that of Defendants: "Sergeant Witt saw Smith's hands, knew Smith did not have a weapon and knew he was intoxicated. Smith was trespassing, a crime so slight that neither Sergeant Witt, nor Officer Kennemer bothered to write a report of it. Nonetheless, Smith was shot seventy (70) to eighty (80) times by Sergeant Witt. The attached pictures show Smith was even shot under the arms, likely meaning Sergeant Witt shot Smith even after he had complied with an order to raise his arms. Sergeant Witt testified that " it was not safe to enter a small room with so many unknown variables [i.e., the closed bathroom and the possibility that a weapon was somewhere under the bed clothes or on the night stand] to risk a potential fight with a large, naked drunk male." However, Sergeant Witt's description of the scene upon arriving at Tudor House Inn is hardly indicative of a fear of being attacked: "I saw a Mr. Smith laying on the bed naked, with his back to the door, to me. I couldn't see his hands ... He just appeared to me to be laying on the bed." Smith did not appear to be intoxicated upon Sergeant Witt's observance.

Sergeant Witt testified he brought his pepper ball launcher to the room with him:

> [A]s a potential tool that could be used depending on what
> Smith's response was. I knew that he was - well, from what
> I had been told, he was intoxicated or appeared to be
> intoxicated. I didn't know what other things he had going on
> as far as maybe some mental illness or some drug-induced state.
> Therefore, I took it as a potential tool that could be utilized
> depending on his decisions that he decided to make that day.

It is uncontested that Smith did not do anything to actively resist or threaten Sergeant Witt. According to Sergeant Witt, Smith's decision not to respond to his directions, as far as a semi-conscious person is capable of making decisions, was sufficient to warrant the use of seventy (70)

9

to eighty (80) pepper ball strikes. Sergeant Witt was not faced with the need to make any split-second decisions, nor can the circumstances fairly be described as constituting a "tense uncertain, and rapidly evolving situation." *Graham,* 490 U.S. at 397; see also *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009). There was no indication that Smith would (or could) use anything in the room to harm either Sergeant Witt or Officer Kennemer. Smith did not reach for anything; he did not threaten anyone, verbally or physically. Any "threat" posed by the motel room was obviously not very great considering Sergeant Witt and Officer Kennemer eventually entered the room anyway without any change in the potential variables." (*Plaintiff's Response at 16-17*).

Plaintiff concludes that: " a reasonable officer would not consider the "variables" identified by Sergeant Witt in entering the motel room a realistic threat to his personal safety such that seventy (70) to eighty (80) pepper ball strikes would be necessary — especially when the first few wholly failed to illicit compliance, or any kind of response from Smith. Sergeant Witt himself obviously did not consider seventy (70) to eighty (80) strikes as reasonable or warranted; that is why he stated in his Use of Force Report that he used only fifteen (15) strikes. The force used on Mr. Smith to arrest him for a ticketable misdemeanor when he was naked, unarmed, and nonviolent, and when he was not actively resisting arrest or attempting to flee, was patently unreasonable and excessive in violation of the Fourth Amendment." (*Plaintiff's Response at 17-18*).

Accepting the Plaintiff's facts as true, this Court concludes the Plaintiff has established sufficient evidence of a constitutional violation. Whether Sergeant Witt reasonably interpreted Smith's refusal to leave the motel room "as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for the jury to decide." *Brown*, 574 F.3d at 496.

In regard to Officer Kennemer's role, there are also two different versions of the facts. Sergeant Witt was Officer Kennemer's supervisor. Officer Kennemer contends during the time period she was at the Tudor House Inn, she only witnessed Sergeant Witt launching 4 to 5 pepper balls at Smith. However, Smith alleges according to Sergeant Witt's own testimony, Officer Kennemer was present for most of the pepper ball strikes. Smith argues Sergeant Witt's account is more believable because the undisputed evidence demonstrates Officer Kennemer arrived at the scene five (5) minutes after Sergeant Witt. Sergeant Witt arrived at 1:10 p.m., spent approximately a minute speaking with the motel manager, Mr. Patel, before proceeding to Smith's room. "According to Sergeant Witt, he tried using verbal commands for five (5) minutes before he resorted to the pepper ball gun. Sergeant Witt would not have had time to fire seventy (70) to eighty (80) shots at Smith, especially the frontal shots to Smith's face, chest and penis for which Smith would have had to turn around to face Witt, before Kennemer arrived."(Plaintiff's Response at 13). Plaintiff concludes this evidence suggests Officer Kennemer was present for the majority of the strikes. "She saw that Smith was naked and unarmed. She saw that Smith was not responding to the strikes. She knew that Smith was nonviolent, allegedly guilty of a minor, nonviolent misdemeanor, and was not actively resisting arrest or attempting to flee." *Id*. at 13-14.

It is clearly established that a state actor may be liable for unreasonable seizure and excessive force under the Fourth Amendment if he or she fails to prevent the unconstitutional use of excessive force by another official. *Mick By and Through Mick v. Bever*, 76 F.3d `1127, 1136 (10th Cir. 1996)("Tenth Circuit precedent clearly established before June 18, 1992 that a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under §1983); see also *Lusby v. T.G. & Y Stores, Inc*., 749 F.2d 1423, 1433 (10th Cir.

1984)(ruling that officer who did not prevent fellow officer's use of allegedly excessive force against an arrestee "may be liable [under §1983] if he had the opportunity to intervene but failed to do so"), vacated on other grounds 474 U.S. 805 (1985).

Accordingly, there remain questions of fact for a jury determination as to whether Officer Kennemer is liable to Smith due to her failure to intervene in Sergeant Witt's alleged use of excessive force against Smith.

### C. Was the constitutional right clearly established?

Having determined that the Plaintiff has sufficiently alleged a constitutional violation, the court now turns to the second prong of the qualified immunity analysis: asking whether existing case law gave the Defendants warning that their conduct violated the Plaintiff's constitutional rights. See *Novitsky v. City of Aurora*, 491 F.3d 1244, 1255-56 (10th Cir. 2007). When conducting this inquiry, "[t]he central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1283-84 (10th Cir. 2007).

It has long been clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest. *See Casey*, 509 F.3d at 1283-84. There is

12

no doubt that *Graham, supra,* and *Casey, supra,* clearly establish the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. These cases set forth the general legal framework with regard to reasonableness in the Fourth Amendment context.

The Defendants, do not argue the law was not clearly established, however, they argue Sergeant Witt and Officer Kennemer did not violate clearly established law. As such, this Court finds the constitutional violations at issue were clearly defined prior to this incident. Further, there remain questions of fact for a jury determination.

**D.      Did the City's Use of Force Policy Comport with Constitutional Standards ?**

The parties agree the City of Tulsa is not liable for the individual acts of an employee, but a municipality is only liable when a plaintiff can establish an institutional policy or custom resulting in a deprivation of constitutional rights. The Supreme Court, in <u>*Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978)</u>, held that municipalities could be liable under §1983 if

> the action that is alleged to be unconstitutional implements
> or executes a policy statement, ordinance, regulation, or
> decision officially adopted and promulgated by that body's
> officers. Moreover, although the touchstone of the §1983
> action against a government body is an allegation that official
> policy is responsible for a deprivation of rights protected
> by the Constitution. Local governments, like every other §1983
> "person," by the very terms of the statute, may be sued for
> constitutional deprivations visited pursuant to governmental
> "custom" even though such a custom has not received formal
> approval through the body's official decisionmaking channels.

The Supreme Court further refined its *Monell* decision in *Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986),* by holding that in order to affix liability to a municipality under §1983, the alleged unconstitutional acts must be committed by an official possessing final policymaking authority with

13

respect to the alleged acts. Further, *Pembaur* made clear that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances...because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id.*

Alternatively, municipal liability may be based on the *existence of a widespread practice of which the policymakers must have been aware. Praprotnik*, 485 U.S. at 127. The offensive policy must emanate from an officially promulgated decision or from a practice which is well-settled and permanent. *Monell, 436 U.S. at 691.* In addition, there must be a showing that the policies of the municipality were directly connected to the constitutional deprivation. *Berry v. City of Muskogee, 900 F.2d 1489, 1499 (10th Cir. 1990).*

Considering the record in the instant case, there is no evidence Sergeant Witt, or Officer Kennemer are official policymakers for the City of Tulsa. Further, there is no evidence of a widespread practice or policy of the City of Tulsa which allows the use of excessive force to effectuate a misdemeanor arrest. Accordingly, the City of Tulsa's Motion for Summary Judgment is granted.

## **CONCLUSION**

For the foregoing reasons, the Court finds that Defendant's Witt's and Kennemer's Motions For Summary Judgment are therefore **DENIED**. The City of Tulsa's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED** this 22nd day of March, 2012.

_____
James H. Payne
United States District Judge
Northern District of Oklahoma